Life Insurance, Mr. Simon, I believe. Your Honors, I'd like to reserve four minutes. Just keep an eye on your time. That's fine. I'm sorry. Just keep an eye on the time. That's fine. Very good. Thank you, Your Honor. Your Honor, this is our appeal. Obviously, I represent the Martins. Speak up a bit. Certainly. Pull that mic forward a little. That's it. And then lean in just a tad. There we go. All right. Your Honor, this court erred and should be reversed because of several reasons. The primary reason is that it ruled as a matter of law that the misrepresentations, alleged misrepresentations on the application were material as a matter of law. It erred when it ignored crucial evidence, because this is a material fact that a trier of facts should decide. The one crucial evidence that it ignored was the deposition testimony of the underwriter, George Diaz, who was posed with the question that the exact information that was allegedly omitted, if he even reviewed that at the time of the application, it would not have changed issuance of the policy and it would have been issued at the standard rate. This is important because the district court is relying on the Redondo case, and in that case the omitted information would have changed the rate of the policy, which 687B defines as material. But in this case, because Mr. Diaz says that that information, if reviewed even at that time, would have been issued at the standard rate, by definition under the statute, it is not material. Did the underwriter say that if he had known of this information, this new information, that he would have waited for further test results? But that's the problem, Your Honor. Or? Well, that's the problem, because that's his self-serving statement that that's what he should have done. This is a post-claim underwriting testimony that, oh, this is what we would have done. I submit to you that that's a question of fact, whether he would or would not have done certain things. The evidence to which you are referring, where is that in the record and what does it say? The information that you are referring was that they would have issued the same rate, but I thought their testimony was that they wouldn't have issued it at all and they would have waited to find out whether this negative stress test was. Correct. That's his testimony, that he wouldn't have issued it had he known this and then he would have waited. But I pose him the hypothetical question, Your Honor, in the deposition which we cited to our excerpts, is that if he had the information and known the results as they ended up being. They ended up being, I see. Excuse me? As they ended up being. Correct. But it was also true that at the time the results ended up, they also had cancer results at that same time. No, that was after the application period, Your Honor. It wasn't until early May that there was any evidence of cancer. In the record, the only evidence was related to a cardiac problem. That was the April 6th, April 7th visits with Dr. Niebauer. And when we took the deposition of Dr. Niebauer, he testified to a reasonable degree of medical probability he did not have a cardiac problem. George Diaz indicated. Hold on one second. Judge Hawkins? I'm fine. I'm right here. Okay. All right. Mr. Diaz indicated that there is no cardiac problem. Let me see if I understand the sequence. Certainly. My understanding is that he went to the doctor on August 6th. He filed the application in April 6th or 7th. The application was shortly thereafter. Then later he went to the doctor, had another stress test which was negative, but at the same time as that second visit, they did the test that turned up the cancer. No, they did a series of blood work and then other testing after that. But the initial application was April 16th. Then they screwed that up, which is never addressed by the district court, too. That's another error that they gave him the wrong application, which goes to the agent, and his negligence was also a question of fact. And then on April 28th, they sent in an application with a payment, which at that point binds the company and as well as the agent that at that point in time, the policy is effective as date of the application. But was it after that, after that, that both the stress test, the negative stress test and the cancer results were done? Correct. After April 28th. Correct. But Dr. Niebauer testified that the earlier stress test was a false positive. There was no indication that it was abnormal, and he also testified that he never mentioned that to the Martins. So they had no knowledge of the results of the stress test or that it was a problem. He's had many EKGs or stress tests in the past for other issues that also were normal. So there's no ---- So they didn't know when they filed their application that there was a negative stress test. Correct. Or a false positive or that it was ---- Or a positive, whatever it was. Well, and I submit to you, Your Honor, it was not positive because, and that's one of the facts that's misstated by the lower court. He, in issuing his decision, concludes that, oh, that test is abnormal. That's not true. Dr. Niebauer confirmed that in deposition, that it's a false positive. He also indicates in his decision that Mr. Kelly, the agent, asked him specific questions on the application and that Mr. Martin specifically replied to these applications' questions. That's also incorrect, and that's also stated in our excerpt 11, page 5, where Mr. Kelly signs the application himself and says, in the presence of proposed insured, have you asked each and every question exactly as written and recorded the answers? He indicates no and says I've transferred all the information from a prior application. That is important because the prior application in this case was done six months prior, and that was all the medical information that United of Omaha relied on. The lower court eventually signed something saying that he had, in fact, got over all the questions thereof. But, Your Honor, that is also an issue of fact, and the authority that we've cited is the fact that when an agent, which they rely on, which they did in this case, incorrectly fills out the application and they don't read it, they can rely on that agent in signing it. If it's incorrect, it's going to be on the agent, and that is the negligence that the jury needs to decide in this case as to Agent Kelly. The lower court never even addresses Kelly or his actions. The lower court basically just says that the representations are material, and as this court is well aware, NRS 687B protects the insured and allows recovery even if there are some omissions, even if there are misrepresentations. It has to be material, and it's the materiality of this case that makes it a question of fact, and it should not be decided on summary judgment, and it appears that the lower court is construing all facts in favor of the defense when it should be doing it for the insured. Would you like to take the balance of your time for rebuttals? Yes. Thank you, Your Honor. Good morning. I'm Scott Bales for Appellate United of Omaha. With the court's permission, I'll try to limit my remarks to no more than seven minutes and leave the remainder of the time for counsel for co-appellate, Mr. Kelly. The issue is not whether at the time Mr. Martin completed the application he should have disclosed that he had heart disease. That's not at all the question in the case. The question is whether he provided inaccurate answers to specific questions in the application. What was not disclosed and what should have been disclosed was that on April 6th, only 10 days before he first completed the application, he'd called his physician complaining of shortness of breath, fatigue, and shoulder pain, and his physician had told him those were conditions consistent with angina and he should have an EKG done as soon as possible. Now, that was information that was specifically called for in the application in several different ways. The application, which is at tab 13 of the excerpts of record, asked Mr. Martin to identify if he'd ever consulted a doctor regarding any abnormal heart condition or angina. That's in question 3A. It also asked if he'd ever consulted a physician regarding shortness of breath. That's in question 3B. Does it matter to you who filled out this form? Well, it doesn't because for several reasons, Your Honor, that it doesn't. First, Mr. Martin, on the 16th when he completed the policy, affirmed that he had reviewed it and the answers were true and correct. Second, that wasn't the only time that he signed the policy. Because there was an incorrect form, the policy was mailed directly back to him by the brokerage company, and he again signed it on April 28th without any involvement of Mr. Kelly. And that's the particular policy I'm referring to that's at tab 13 of the excerpts of record. Finally, Mr. Kelly was an independent agent, and he's regarded as the insurance agent in the application process. He wasn't a captive broker or an agent of United of Omaha. And that's illustrated by the fact that Mr. Kelly had shopped several different insurance companies trying to find coverage that Mr. Martin would find acceptable. What I was going to ask was that you also argue that regardless of any of this, there's a separate provision in the agreement that says that no policy of any kind will be in effect if there's a change in its health before the delivery of the policy. Now, that's a much more sort of clean and easy way to decide the case, unless there's a problem with it, the problem being whether there's an obligation on the insurer to ask or on the agent to ask about that, rather than simply relying on the insured. Well, the Stipchich, I believe, is the case you're referring to, and that rule is grounded on the obligation on the insured to, in good faith, reveal changes in their health that occur between the time of the application and its delivery, if, as is true here, it's a policy that basically says, if your condition changes between the time you've applied and the time the policy is delivered, there will be no coverage in effect. Are the agents specifically asking that question at the time of delivery? No, at the time of delivery, the testimony is that nothing was asked. Now, there is testimony that earlier, at the time of application on April 16th, I believe Ms. Martin's testimony, Mrs. Martin's testimony, was that the agent asked if anything had changed or if his health had changed. But it doesn't require the insurer to ask at the time of delivery if anything had changed, because the rule, again, is grounded on the good faith obligation of the insured to disclose if their health condition has changed, and indeed that obligation here was specifically stated in the policy. If you look at the last page. But the problem is we have, I mean, this would ultimately depend on Nevada law. I mean, I understand that there is some case law in at least one state holding that there is an obligation on the insurer. We don't know what Nevada law is. Is that the problem? Well, it's true that there isn't a Nevada, a reported Nevada case that we found that embraced the Stipchich test. As we noted in our brief, that's a rule that seems to be generally recognized. As we noted in the supplemental citation, a recent decision by the Arizona Court of Appeals recognized that that's a rule that's generally accepted in other jurisdictions. But you're right, there's not a published Nevada case that embraces that rule. But that brings me back to a point that is important to recognize. There are four alternative bases for upholding the district court's ruling, and each of them is independent. One is the materiality of the omissions, and those can be decided as a matter of law. Because if you take the reasoning of the Rondondo case, which held that the failure to disclose elevated blood pressure was as a matter of law material, it would seem to follow here that an insurer's failure to disclose that less than 10 days before applying, he had consulted his doctor for shortness of breath, fatigue, left shoulder pain, and his doctor telling him this is consistent with angina, tells him to get a stress test as soon as possible. The omission of that information clearly would be material. And the testimony of Mr. Diaz doesn't raise a fact issue on that point. Well, more at least indeterminate than redundant, isn't it? Because here we have a negative stress test. A, is it true that they didn't know the result? There's no evidence that they knew the result as of April 6th. But, again, the question in the application. They didn't say that they went to the doctor, but they had no particular reason at the time to think that they, in fact, had any negative health information. There's no indication they knew on April 16th what the result of the stress test had been. But aside from that, the difference between this and Rondondo was in Rondondo he did have a high blood pressure result at that time, at the time he applied. Here, and there was testimony that that information would have affected the, simply that information would have affected. Actually, I believe in Rondondo it was a history of high blood pressure, and there was some suggestion by the time he applied he no longer had high blood pressure. But anyway, just that information would have affected the rates. Here, it's that if they had this information, they would have gone and investigated. Well, there may be a question about would they really have gone and investigated. And then if they had investigated, they would have found this information. And then if they had found this information, they would have waited. It just gets somewhat attenuated. And the question is at least whether a jury should look at that rather than being looked at on cold paper. No, and the reason, and this actually gets at the other alternative reason summary judgment was appropriate. The testimony by Mr. Dias that the company would not have issued the policy had they known the facts of his complaints to his physician and that he had taken an EKG 10 days before he applied. Those are not disputed. And like Rondondo, there's nothing to dispute the company's testimony that had it known that, it would not have issued the policy. And I'd refer you to the tab 8 in Appellant Kelly's excerpts of record. If you look at pages 77 to 80 and then 112, 114, and 116 to 117 of Mr. Dias' deposition, it's clear that had they known that he had these symptoms and had gone to a doctor or had consulted a doctor and the doctor had told him get a stress test as soon as possible, the company, given that information, would not have issued the policy. And as in Rondondo, where the evidence showed the company would not have issued the policy at the rates provided, this was sufficient to uphold the company's rescission. And I'll stop so that. Thank you, counsel. Thank you. Counsel for Mr. Kelly. Good morning. I'm Valerie Edwards for John Kelly. The plaintiff's claims against John Kelly are based in negligence, either in failing to put the information that United of Omaha relied on in rescinding the policy or in putting the wrong information. Under either way, pursuant to George Dias' testimony, the policy wouldn't have been issued. So any negligence on the part of John Kelly wasn't an approximate cause. And under 687B, the court found that the information was material based on Mr. Dias' uncontroverted testimony and held that the policy could be rescinded. So the basis for any claims against John Kelly are obviated by the court's ruling under the statute. Wasn't there a claim that he should have offered them temporary insurance? That was raised, and the court did note that in passing, but if you look in John Kelly's deposition transcript, which was attached to our assertive record and cited in our brief, he indicated that temporary insurance would have only been effective between the time the application was submitted and the time the policy issued. And in this case, it wouldn't have made any difference whether or not temporary coverage had been afforded because the date of death occurred after the policy was issued. Okay. Thank you, Counsel. Thank you.  Thank you, Your Honor. Whether Mr. Kelly is actually negligent is a question of fact. There's many issues that are there in regard to him. He admits he has a duty to correctly fill out the application. He's the only one that filled it out. There's argument that the new April 28th application was sent from a different broker, but notably that application was already filled out based on with all the information from the original application that Mr. Kelly filled out. They gave Martin's instructions, sign it and send it back. Why that's important is when the Martins sent that back, they also tendered the first premium check. With the first premium check, Paragraph 3 applies to this case. Paragraph 3 says that when the first premium check is paid, the policy is effective on the date of the application. The date of the application in this case, Your Honor, is April 28th. There's no indication of any cancer until May. Why does this make a difference, whether it was April 16th or April 28th? Because the alleged he had a duty to disclose at the time of delivery, which is May 18th, is not an issue in this case because the effective date here is the date of the application, which is April 28th or arguably even April 16th. The other issue too is that Mr. Kelly admits he has a duty to provide correct forms. He admits that there was a 12-day delay caused. He says it's reasonable to assume that the policy would have been issued 12 days earlier. If that's the case, then this policy is delivered at least 12 days earlier or on, just to do the math, April, May 4th, which is before he had any indication of cancer, which is May 11th. So that is a non-issue that they're trying to create. So the only issue in this case, Your Honor, is whether or not the representations on the application are material. Those are issues of fact. Also with regard to Kelly, whether he correctly filled it out, whether he correctly provided the right forms, whether he advised them properly. If he had correctly filled it out, then apparently they wouldn't have gotten it. That's not true because we're assuming that Mr. Diaz or the underwriting department would have actually conducted an investigation. I'd like to point the Court to the same Excerpt 11 in our exhibits, which is the application. The main thing that they're talking about is we didn't disclose Dr. Niebauer. Well, I respectfully disagree with that because Dr. Niebauer's name, address was disclosed. A full medical authorization was given for them to obtain any records they wanted. And notably, he actually listed the date last seen. Kelly incorrectly listed the date last seen, January 99, which was only three months before this application. The defense relied on medical information six months ago. So if they didn't go out and get records from Dr. Niebauer, How did they get the January 9th date or 19th date? Well, that must have been, I don't know, that's from the old application or The last application was before January 19th. Then he must have got that from whether he did some other due diligence in the meantime to try and shop some other, I guess he was shopping several different insurers. So whether it was part of some information he obtained in seeking out other insurers, that I don't know. But what is definitely in dispute, or not really in dispute, in the fact that he did not ask the Martins any questions on that application. He only asked one question. Had your health changed? Mr. Martin truthfully answered no, because he had no information suggesting that his health had changed. And on the application itself, Mr. Kelly openly admits by signing it that he never asked them any questions or each and every question. So when he gives self-serving deposition answers that I asked him everything, that's a factual dispute as well. I'm sorry, I didn't understand that. How did he admit that? He admitted in the application, Your Honor, in our excerpt on the last page, it's the agent-broker statement where he signs, attesting to questions that it states, In the present of the proposed insured, have you asked each and every question exactly as written and recorded? He answers no and signs it. And he gives an explanation for why he didn't ask those questions. But he just transferred the information. He says I transponded information from prior life insurance applications with applicant's approval and consideration. Is that what you're talking about? Correct. And the authority recited that my client is allowed to rely on him, and they don't have to read it, and they can sign it, and they can rely on him. And that's a question of fact whether he committed negligence. So to dispose of this case on summary judgment certainly is construing all facts in favor of the insured when it's supposed to be construed in favor of my client, Your Honor. But the short version of what you just said, if I understand it, is that they did, in fact, have information of a more recent doctor's visit, although not the April 7th one, and they did not, in fact, investigate. So how do we know they would have investigated the other one? Correct. Why would they even go out and do it? There's no evidence to that that they would do that, and that's a disputed fact, and that should be for a jury to decide what they would actually do in their investigation. What about the delivery issue? In regard to what? The issue, the provision that says that he's supposed to update them before, if his health has changed. Right, and that hasn't been decided in Nevada. Our position is that he doesn't have to have it. If he's not asked, then he doesn't have a duty. How are we supposed to decide that under Nevada law? I mean, I gather the law in most jurisdictions, all but Illinois, as far as I can tell, is that that is enforced as written as opposed to having some obligation on the insurer to ask. Well, I guess the problem we have is that we have Agent Kelly, who I submit to as an authorized agent because he was actually approved and signed contracts with United of Omaha, but he was given instructions specifically to ask that question and didn't do it. So, therefore, he has negligence. But the duty to disclose, as I stated previously, I believe is a non-issue, A, because of the negligence of Kelly in the 12-day delay, and also because of paragraph 3 on the application when she tendered the premium payment. The date, the effective date of the policy is the date of the application, which is no later than 4-28, leaving the only issue whether. . . Non-issue in the long run, but it certainly may tell you something about at least who's liable, whether it's Kelly or the company. Correct. And whether the court finds that Kelly is responsible to the company for not doing what he's supposed to, I mean, those aren't issues that should be scrutinized against the appellant. I think that a lot of scrutiny has been given to the appellant, and I think some scrutiny should be given to the other parties. Thank you, counsel. Thank you, Your Honor. I appreciate your argument. The matter will stand submitted. Thank you.
judges: Hawkins, Paez, Berzon